# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

BRETT RONALD MATTESON,                    1:12-cv-00060-AWI-BAM (HC)

               Petitioner,          FINDINGS AND RECOMMENDATION
                                          REGARDING PETITION FOR WRIT OF
    v.                               HABEAS CORPUS

                                          [Doc. 1]
LELAND S. McEWEN,

              Respondent.

_____/

     Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### PROCEDURAL HISTORY

     Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of several counts of identity theft (Cal. Penal Code[1] § 530.5, subd. (a)), manufacturing of deceptive identification documents (§ 483.5, subd. (a)), and theft of access card account information (§ 484e, subd. (d)).  Petitioner admitted the truth of the prior prison term allegations.  Petitioner was sentenced to a total term of 37 years and 8 months in state prison.

     Petitioner filed a timely notice of appeal on March 4, 2010.

     On June 1, 2011, the clerk of the superior court prepared and filed a new abstract of judgment to address certain counts which had been omitted from the original abstract of judgment filed on March 8, 2010.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

On September 7, 2011, the California Court of Appeal, Fifth Appellate District reversed Petitioner's conviction for count 47 and remanded for resentencing, but affirmed the judgment in all other respects.

On December 14, 2011, the California Supreme Court denied review. Petitioner did not file any state post-conviction collateral petitions.

Petitioner filed the instant federal petition for writ of habeas corpus on January 10, 2012. Respondent filed an answer on May 3, 2012, and Petitioner filed a traverse on May 29, 2012.

STATEMENT OF FACTS[2]

**Summary of Facts Relating to Identity Theft
(Counts 1-48)**

The prosecution presented evidence to show that debit and/or credit card information for 47 individual victims was set forth on documents found at [Petitioner's] home. [Petitioner] did not obtain their permission to acquire the information, and there were unauthorized charges on their credit accounts. Those unauthorized charges were made between April and September 2007.

Twenty-six of the victims had used their credit cards at the Red Robin Restaurant in the River Park area of Fresno prior to the dates of the unauthorized charges. Nine of the victims had used their credit cards at Goldfield's Restaurant at Chukchansi Casino.

**Conceded Error (Count 47)**

[Petitioner] contends and the People concede that count 47 is not supported by substantial evidence. Jill Gonzales identified her credit card number on documents found in [Petitioner's] possession. However, Gonzales did not testify that there were unauthorized charges on her account. The People agree the judgment of conviction should be reversed as to this count.

**Summary of Facts Relating to Manufacture of Deceptive
Identification Documents (Counts 50-58)**

A number of witnesses testified they had gone to [Petitioner's] home and had obtained "fake" or false identifications from him.

**Summary of Facts Relating to Theft of Access Card
Account Information (Counts 59-110) (fn. 2)**

[FN. 2] The court dismissed counts 63, 73, 75, and 84 on motion of the prosecution and facts relating to those offenses are not included in the statement of facts.

---

[2] The Fifth DCA's summary of the facts in its September 7, 2011, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

The prosecution presented evidence to show that debit and/or credit card information for the victims of these counts was set forth on documents found at [Petitioner's] home. [Petitioner] did not obtain their permission to acquire the information, and there were unauthorized charges on their credit accounts. Those unauthorized charges were made between April and September 2007.

### <u>Facts Applicable to All Charged Counts Testimony of Patrick Adolph</u>

In December 2007, Patrick Adolph went to [Petitioner's] home to get a fake identification. Adolph said he was 20 years old, going on a trip and wanted an identification that stated he was 21 years of age so that he could get into bars. Adolph said [Petitioner] "was a pretty popular individual by word of mouth around the local high schools at the time. So it was pretty easy to get in contact with him." Adolph obtained [Petitioner's] phone number and made an appointment to meet at [Petitioner's] home just south of Palm and Herndon Avenues. [Petitioner] opened his garage, and Adolph accompanied him to an area with a computer, printer, and a cabinet with a backdrop for taking pictures. [Petitioner] used Adolph's driver's licence to calculate the false date of birth. As [Petitioner] processed the picture for the false identification, Adolph mentioned he worked as a server at the Sequoia Brewery Restaurant and had done so for two and one-half years. [Petitioner] told Adolph he was involved in credit card theft, showed him a wallet filled with numerous credit cards, and explained how the process worked. Adolph said, "He showed me how you can have a person's name on the front, but the information that he gets from the different credit cards is completely different on the back, so it will say your name on the front but then it will be somebody else's credit card on the back."

[Petitioner] took Adolph inside his house and showed him items he had purchased using the credit card numbers of other individuals. The purchased items included a flat screen television in [Petitioner's] family room. [Petitioner] gave Adolph a list of stores "that were a-okay to shop at that you would not get in trouble for." [Petitioner] then told Adolph he had unnamed servers and bartenders working for him at Red Robin and Campagnia restaurants. According to [Petitioner], these restaurant employees would swipe the credit cards of patrons through "a little black scanner" to collect credit card account information. [Petitioner] said he was then able to place that information "on the credit cards he has available."

[Petitioner] asked Adolph whether he would be interested in doing similar work for [Petitioner] in exchange for "an allowance," in an unspecified sum. [Petitioner] also offered to take Adolph on a Christmas shopping trip if he agreed to participate. Adolph told [Petitioner] he would get back to him later. Adolph took the fake identification and paid [Petitioner]. [Petitioner] called Adolph later and asked whether he was interested in his proposition. Adolph told [Petitioner] he would get back to him. Adolph then contacted Fresno Police Detective Ken Dodd, gave him a statement, and then showed Dodd the location of [Petitioner's] residence. At some point Dodd told Adolph he could be arrested on criminal charges for being in possession with a false identification. However, Dodd did not threaten Adolph with prosecution.

### <u>Testimony of Kristen Brandon Marie Larsen</u>

Larsen testified a mutual friend referred her to a man nicknamed "Casper" who knew someone who could get her a fake I.D. because she was under age 21. Larsen picked up Casper and he guided her to a home. Larsen and Casper entered

3

the garage of the home.  Larsen said there was "[a] computer by a door and that was it."  Larsen said [Petitioner] was alone in the garage when she and Casper arrived. [Petitioner] set up a hanging blue screen, took her picture, and entered her information into a computer.  She instructed [Petitioner] that she wanted her birth information to reflect that she was 21 years of age.  She paid [Petitioner] $150 for the false identification and left the home.  Larsen said a bouncer at a Clovis establishment later took the false identification away from her.  Larsen contacted Casper again, he gave her [Petitioner's] phone number, and Larsen contacted [Petitioner] directly.  She went to his home alone the second time and took another photograph for a second false driver's license.

On the second occasion, she and [Petitioner] had "an engaging conversation" and he asked her whether she knew anyone working in the restaurant business.  He explained how "he would swipe [credit] cards and somehow put it on gift cards.  He also asked whether she knew anyone in the restaurant trade who would be willing to do that for him.  Larsen went a third time to [Petitioner's] garage in the company of her friend Megan and Megan's friend.  Megan and her friend went to get false identification cards.  Larsen went to [Petitioner's] garage a fourth time in the company of her friend, Johnny Juarez, who also had a false identification made.

**Testimony of Mitchell Alexander Isaak**

Isaak testified his friend, Alyssa Whited, was conducting promotions at local bars.  Whited was not yet 21 years of age when her agent arranged for her to obtain a false identification in 2007.  Isaak was 19 or 20 years of age at the time and he, too, wanted a false identification to obtain alcohol.  A man named Casper put Whited in touch with [Petitioner].  Whited, Isaak, and one Derek Welch went to [Petitioner's] home and entered through the garage.  A blue backdrop was hanging from the garage ceiling.  Whited, Welch, and Isaak each stood in front of the backdrop and had their photographs taken. [Petitioner] put the photographs on a laptop computer, which was set up in the garage next to a large printer.  Isaak said [Petitioner] asked the trio for information, including name, address, and birth date.  The computer generated an identification card, which Isaak subsequently lost while riding an ATV in the desert.

**Testimony of Rammel Gabriel Del Mundo**

Rammel Del Mundo testified he had a false identification made in 2007 so that he could go to bars and drink.  Del Mundo said Johnny Amparano, a friend from high school, had a false identification and said he could arrange for Del Mundo to obtain one also.  Amparano took Del Mundo to a home in the area of Bullard and West Avenues, and they entered through the open garage.  Del Mundo stood in front of a light blue background, placed his feet against some duct tape markings on the ground, and had his picture taken.

Del Mundo said the photographer took down some personal information and said the identification would be ready in 90 minutes.  Del Mundo returned at the appointed time, paid the photographer around $150, and obtained the identification card.  Del Mundo said there was an error on the card, and the photographer said he would fix it.  They agreed to meet in the parking lot of the Save Mart store at Bullard and West Avenues, and the photographer gave Del Mundo the corrected card at that location.

While at the garage, Del Mundo and the photographer spoke about another aspect of the latter's business. The photographer said people would stop by his mailbox at night and deposit information in the box. The photographer would retrieve that information in the morning and then make credit cards that would enable the people to buy television sets and other merchandise. Del Mundo could not identify the photographer in court but did identify him to Detective Dodd after viewing a photo lineup on June 24, 2008. Del Mundo said he threw away the false identification when he turned age 21.

### Testimony of Nolan Fitzpatrick

Nolan Fitzpatrick testified he was currently on felony probation in Madera County for violating section 484e, subdivision (d), acquiring access card information of others with intent to defraud. Fitzpatrick said he wanted to get a fake identification when he was age 20 because he had friends over age 21 and wanted to "hang out" with them at a nightclub. Fitzpatrick and his roommate, Hans, had a friend named Phong Tran who lived next door to [Petitioner]. Tran and Fitzpatrick worked at Chukchansi Casino. Tran was a bartender or "bar back" and Fitzpatrick was a waiter. In 2007, Fitzpatrick went to Tran's home for dinner and spoke about the possibility of obtaining a false identification. Tran called [Petitioner], made arrangements, and Fitzpatrick went next door to [Petitioner's] home and obtained the fake identification. Fitzpatrick entered [Petitioner's] garage, stood in front of a large blue cardboard, and [Petitioner] took his picture. [Petitioner] uploaded the photograph into a laptop computer and generated "a California-looking driver's license."

[Petitioner] asked where he worked, and Fitzpatrick said he worked as a waiter at Goldfield's Restaurant in Chukchansi Casino. [Petitioner] noted that Fitzpatrick was already breaking the law by getting a fake I.D. [Petitioner] then asked whether Fitzpatrick would be willing to "card read," i.e., run credit cards through a black scanning device at his workplace. [Petitioner] explained the information would be used to make gift or credit cards to purchase items. Fitzpatrick agreed to the arrangement and took the scanner to work. He scanned the credit cards of customers in the device after properly running their cards through the restaurant's cash register. A few weeks after taking the scanner, Fitzpatrick brought the device back to [Petitioner's] home, and [Petitioner] connected the scanner to his laptop computer. Fitzpatrick saw bank routing appear on [Petitioner's] computer screen.

[Petitioner] told Fitzpatrick he would use the scanned credit card information to make some gift cards for Fitzpatrick. [Petitioner] pulled some gift card blanks from his wallet, ran them through the scanning device, and gave the coded gift cards to Fitzpatrick. [Petitioner] and Fitzpatrick followed the same procedures on four additional occasions. Fitzpatrick used the gift cards to purchase items. He said he knew the gift cards bore stolen credit card information. Fitzpatrick said he scanned customer credit cards from the beginning of April 2007 until he was caught in June 2007. Fitzpatrick said he targeted customers who were mean or rude to him. Fitzpatrick estimated he made between 2,000 and 4,000 purchases using the credit cards. The purchases were at such stores as Best Buy and Sears.

On an early morning in June 2007, deputies from Madera County Sheriff's Department went to Fitzpatrick's apartment on Nees Avenue in Fresno and took the scanner and the items he had purchased with the gift cards, including a helmet, jacket, gloves, a camera, and an iPod. The deputies also took an identification

5

card bearing the name "Craig Shane Smith." Fitzpatrick told deputies he had the identification made so that he could go to bars with Phong and Hans. He falsely told deputies the identification card was made in Kaiser Park. He later falsely told deputies the identification card was made in the front seat of a truck. Fitzpatrick also denied knowing [Petitioner] or where he lived. The deputies did not place Fitzpatrick under arrest. A day or two after the deputies went to Fitzpatrick's apartment, [Petitioner] contacted him and nervously told Fitzpatrick not to tell anyone his name or address. Fitzpatrick and [Petitioner] had gone shopping together on at least one occasion, and [Petitioner] used the gift cards to buy an iPod at Best Buy and accompanied him on at least one shopping trip to show Fitzpatrick how to use the gift cards. [Petitioner] also advised Fitzpatrick to wait at least a month before using a gift card with third party account information so that the account holder would not be able to trace the location where the credit card was compromised.

Fitzpatrick testified he was fired from his job at Chukchansi Casino because of the card reading. Phong Tran was also fired, but Fitzpatrick did not know when or the reasons for the firing. Fitzpatrick did tell the security supervisor at Chukchansi that Tran was his contact with [Petitioner].

**Testimony of Jessica Wiggs Foster Baldwin**

In June 2007, Jessica Wiggs Foster Baldwin was a waitress at the Red Robin Restaurant in the River Park area of Fresno. She had worked at Red Robin since October 2005. She met [Petitioner] through a mutual friend named Casper. She had met Casper at a fraternity and learned he was a photographer. Baldwin went to Casper's home, and he took some lingerie pictures of her. Their mutual friends, J.J. and Tasha, were also present. Baldwin went back to Casper's home a week or two later to look at the photographs on a computer. [Petitioner] was present at Casper's home when Baldwin arrived. Casper introduced [Petitioner], said he had fake identifications, mentioned that Baldwin was under age 21, and asked her if she wanted a false identification so that she could go into bars. He also asked whether Baldwin knew of anyone who wanted to obtain a false identification. [Petitioner] spoke to Baldwin about false identifications. Baldwin said she was not interested in getting one because she would be turning 21 in several months. However, she told the two men she would ask people she knew whether they were interested in getting false identifications. After speaking about false identifications, Casper agreed to place Baldwin's lingerie photographs on a compact disk.

One week later Baldwin returned to Casper's home to pick up the CD. [Petitioner] was present again and asked whether she wanted a false identification card but she declined. [fn. 3] [Petitioner] nevertheless gave her a gift card and encouraged her to recruit other people to come to him for fake identifications. Baldwin used the gift card at Wal-Mart and Mervyn's stores, even though it was a Sierra Vista Mall gift card with a Visa logo.

[FN 3] On cross-examination, Baldwin said she had a false identification at one time, but that [Petitioner] did not make that identification card.

[Petitioner] was aware that Baldwin was a restaurant server and worked all the time. [Petitioner] asked Baldwin whether she would be willing to scan customer credit cards with a card reader but Baldwin said she was not interested. Baldwin received the CD from Casper and walked outside to her car. [Petitioner] followed her outside with a similar CD in his hand. [Petitioner] then told Baldwin

6

she would have to scan customer cards "for a week or so," otherwise her lingerie pictures would be posted from the CD to the Internet. Baldwin testified, "I didn't want to do it but I didn't want my pictures all over the Internet." [Petitioner] gave Baldwin a scanner/reader device. She said there was button on the side of the device and [Petitioner] instructed her to wait for the button to turn green and then scan the credit cards of customers. He also told her he would call in a week, meet with her, and then give back her CD with the lingerie pictures.

Baldwin said she used [Petitioner's] device to scan the credit cards of her Red Robin customers. At some point, [Petitioner] contacted her and said he wanted to collect the credit card numbers she had scanned. Baldwin said she met [Petitioner] at a parking lot in the River Park shopping center and she got into his vehicle, a small, light-brown Toyota truck. [Petitioner] hooked up the scanner to his laptop computer, and he downloaded the card information. After taking the information, [Petitioner] told Baldwin she did not have enough credit card information and that she had to scan more credit cards in order to get her pictures back. She complied, but he did not return the CD. [Petitioner] promised Baldwin a laptop computer in exchange for scanning credit cards, and he made the purchase with her at a Best Buy store in the summer of 2007. [fn 4.] She did not understand that [Petitioner] used stolen credit card numbers to make the purchase. After [Petitioner] bought Baldwin the laptop computer, he said she would have to scan more cards. She continued to scan customer credit cards. Baldwin said she did not go to the police because she was scared.

[FN 4] Detective Dodd testified that officers found evidence of an unauthorized credit card purchase of a Best Buy laptop on August 18, 2007.

At one point, Baldwin attempted to stop scanning customer cards, but [Petitioner] threatened to kill her mother and sister if she did so. Baldwin said [Petitioner] had also threatened to kill his girlfriend, Susan, and her children if Susan said anything about his activities. He also visited the Red Robin restaurant to speak with her during work hours because she would not return his phone calls. Baldwin said she scanned customer credit cards and returned the device to [Petitioner] for downloading somewhere between six and ten times. On one of those occasions, Baldwin and [Petitioner] met in the parking lot of a Raley's grocery store. Baldwin said she ultimately tried to ignore [Petitioner's] phone calls and "was trying just to get away from the situation." At some point in October, 2007, someone broke into Baldwin's truck. She testified that [Petitioner] threatened to cut her brake lines if she did not do what he wanted, i.e., if she did not scan enough credit cards. On October 31, 2007, Baldwin finally quit her job at Red Robin so she would no longer have to scan customer credit cards for [Petitioner]. She explained, "[T]hat's the only way I could figure out to stop everything without having to get in trouble." When she quit her job, she still had [Petitioner's] card scanner in her possession. She had last met with [Petitioner] a couple of weeks earlier.

Baldwin began employment at another restaurant. [Petitioner] found out where she was working, stopped at the restaurant, and tried to talk to her and get the scanner. She lied to [Petitioner] and said she was managing rather than serving in the new restaurant. She claimed she did not have any contact with credit cards and could not get any more account information for him. Baldwin said [Petitioner] was arrested in December 2007 and that he sent her a text message about his incarceration. Upon his release from jail, [Petitioner] contacted Baldwin and advised her not to contact him because the police were tapping or bugging his phone.

Baldwin said Detective Dodd contacted her by telephone on April 14, 2008. She lied to Detective Dodd at [Petitioner's] behest. [Petitioner] had told her that if she claimed she did not know anything, then the police could not prosecute her or get her into trouble. Baldwin and her mother voluntarily went to police headquarters and had a conversation with Dodd on April 17, 2008. Baldwin was not truthful during this interview, telling the detective she had skimmed cards for someone named "Randy" rather than for [Petitioner]. Detective Dodd asked whether Baldwin had been threatened and she broke down in tears and said she was fearful to give a statement. She nevertheless declined to disclose everything that went on and denied that she skimmed credit cards. At trial, Baldwin said she never skimmed credit cards before she met [Petitioner] and did not skim cards between the time she left Red Robin and the time Detective Dodd interviewed and arrested her on August 4, 2008.

Baldwin testified she had skimmed a Red Robin manager's access card that allowed her entry into the Red Robin system. She said [Petitioner] told her not to skim credit cards under her own employee number so that she would avoid detection. On August 4, 2008, Baldwin was arrested for 26 felony counts of identity theft. She said she threw the skimming device over a fence into a field on the day of her arrest. She testified she was scared, stupid, young, nine months pregnant, and did not know what to do with the device. She later tried to retrieve the device using metal detectors but could not find it.

**Testimony of Detective Ken Dodd**

Fresno Police Detective Ken Dodd testified he was assigned to the Financial Crimes Unit of the Department. He began investigating [Petitioner] after receiving the information from Kris Arnold, whose late father had been a Fresno Police Detective. Arnold's information led to Patrick Adolph, who supplied a cellular telephone number and an address on West Browning Avenue in Fresno. Dodd drove by the residence and looked for a white truck but did not see such a vehicle. He ran the cell number through the Fresno Police Department Records Management System (RMS) and Computer-Aided Dispatch System (CAD). Dodd determined that the number was associated with [Petitioner] and the address on West Browning Avenue. Dodd drove by the home a second time and saw a white truck. He ran the license number of the truck and found the vehicle was registered to Suzette Jumper. Dodd ran Suzette Jumper's name through the RMS system and found [Petitioner] listed as her boyfriend. Dodd and Adolph subsequently drove down West Browning Avenue, and Adolph identified [Petitioner's] home at the southeast corner of West Browning and West Avenues, a duplex with two separate residences conjoined at the middle. Dodd also determined the other residence was occupied by Phong Tran.

On December 13, 2007, Dodd and other law enforcement officers searched [Petitioner's] residence. Phong Tran occupied the other, adjoining half of the duplex. Approximately 8 to 15 people participated in the search, including one investigator from the Department of Motor Vehicles. [Petitioner] was present with a teenage girl, the daughter of Suzette Jumper. Jumper came to the duplex and picked her daughter up. During the search of [Petitioner's] portion of the duplex, officers found rectangular tape marks on the garage floor. They also found a blue backdrop, multiple tripods, a Fargo card printer for printing plastic cards, an unopened Xbox 360 gaming device in a Best Buy shopping bag, and a motorcycle. In response to police questioning. Suzette Jumper told officers that the Xbox had been fraudulently purchased. Officers found packs of blank plastic cards with magnetic strips on the kitchen refrigerator and in the garage. The

officers located [Petitioner's] wallet on the kitchen counter. The wallet contained [Petitioner's] commercial driver's license, his crane operator's certification card, a blank card, numerous credit cards bearing [Petitioner's] name, three Target store receipts, a scrap of paper bearing a 16-digit credit card code, [Petitioner's] social security card, a business card for Best Buy customer service manager Justin Cruz, and a Subway rewards and cash card. Detective Dodd determined that account numbers encoded on the magnetic strips of the various credit cards were actually associated with accounts for people other than [Petitioner].

Officers searched the master bedroom and found a laptop computer on the south wall. They also found several USB thumb drives, a camera with case, an encoder, a signature digitizer, and a disk entitled, "Halloween Party 2007." The disk contained a number of photographs, including a picture of a woman with blonde hair whom Dodd identified as Suzette Jumper. They also found a Sony Cybershot camera, a Motorola cell phone, and a shredder containing shredded paper. [Petitioner] was placed under arrested [sic] on December 13, 2007. The following day, Detective Mike Carrillo received a telephone call from a female who said police had overlooked a crucial piece of evidence. Dodd and Detective Heather Ground went to Suzette Jumper's place of employment, picked up Jumper, and went to the Browning Avenue home, which Jumper shared with [Petitioner]. They recovered a Toshiba laptop computer concealed inside a video cassette recorder (VCR). The VCR was located in an entertainment center in the master bedroom. They also found a Sunpak 7500TM tripod and a Vanguard Pro K tripod at the residence, along with three thumb drivers in the master bedroom. Someone used a Visa card belonging to Kevin Hurley to purchase the Sunpak 7500 TM on November 7,2007, without his permission. The detectives gave the laptops, cell phones, thumb drives and a case of compact disks (CDs) to James Lutter of the Fresno Police Department for analysis. One of the flash drives had two sets of credit card numbers linked to Jessica Baldwin, and the concealed laptop had credit card numbers linked to Nolan Fitzpatrick.

On April 22, 2008, Detective Dodd obtained a court order directing Red Robin to provide him with all credit card transactions involving Jessica Foster between June 1, 2007 and November 5, 2007. Dodd obtained the report and testified the victims identified in counts 1, 2, 4-18, 20, 23-24, 39-45, 47-48, 59-63, 65, 68, 77, 79-81, 85-88, 90-106 and 110 had accounts that were included on a list of transactions reflecting Jessica Baldwin's service at the River Park Red Robin Restaurant. Detective Dodd testified that more than 600 names were included on the Red Robin list of Jessica Baldwin's customer transactions. Dodd also testified that James Lutter prepared a photo lineup of suspects, and Rammel Del Mundo identified the photograph of [Petitioner] as the individual who prepared his false identification card. Although Patrick Adolph supplied a description of [Petitioner] to Detective Dodd. Dodd said he did not show Adolph a photo lineup of suspects until after [Petitioner's] arrest. Dodd further testified that Lutter supplied him with a list of names and credit card numbers but that he was unable to contact every single person on the list. Dodd also said he attempted to obtain videotapes from retail stores involved in this case but he learned that smaller convenience stores keep their tapes for just one day, large stores keep them for one week, and "about 90 days is the most that I found, where they will keep it."

Dodd said [Petitioner] was initially arrested on December 13, 2007, but the District Attorney's office did not file charges immediately after that arrest. [Petitioner] was released from custody and re-arrested in early August 2008. Officers found a number of text messages between Casper and [Petitioner] on the

9

latter's cell phone. The messages implied a conversation about the skimming of credit cards. Adolph told Dodd that when [Petitioner] created false identification, Adolph saw headshots of approximately 60 other people on the laptop screen. James Lutter provided Dodd with a report containing more than 60 headshots, including that of Adolph.

**Testimony of James Lutter**

James Lutter, a civilian computer forensic examiner with the Fresno Police Department, analyzed various pieces of equipment seized from [Petitioner's] residence, including cell phones, USB drives, digital cameras, an identification card printer ribbon, Exeba software for operating an encoder, compact disks, a Gateway CPU, a Magcard reader/writer, Topaz Systems SigLite for digitizing signatures, flatbed scanner, laptop computer, Evidence Eliminator program for wiping/deleting computer data, and a ribbon compatible with Zebra, Eltran, and Fargo I.D. printers. He explained how certain pieces of equipment could be used for card skimming and production. He also identified exhibits containing stolen account information and explained how he had retrieved that information from the equipment.

**Testimony of Sharise J. Reimer**

Sharise Reimer testified she had a false driver's license made in 2007 in order to go drinking at bars. She said her friend, Megan Beltz, had already obtained a false identification, and Beltz contacted the person who manufactured her card. Beltz and Reimer went to a home at Browning and West Avenues around Halloween and entered through the open garage. Reimer and Beltz saw Kristen Larsen in the garage. Larsen had lost her first identification card and was having another one made. Larsen and Reimer talked about Las Vegas, and Larsen said her identification did not work there. The person who made the card asked Reimer a couple of questions about what she wanted on her identification, such as name, address, and swiping capability. The man had her stand in front of a blue board and he took her picture. She signed her name and the man generated an identification card that resembled a California driver's license. Reimer said she no longer had the card because her parents disposed of it. She could not identify the man from a photo lineup or in the courtroom.

**Testimony of Derek C. Welch**

Derek Welch testified he had a false driver's license made in 2007 so that he could buy alcohol even though he was underage. Welch said he accompanied Alex Isaak and Alyssa Whited to a home with an open garage. Welch did not remember too much about the manufacturing process for the false identification card but did recall a blue backdrop hanging from the garage roof, and the presence of a computer and printer. Welch said he paid approximately $100 for the false identification, but it was confiscated in San Diego. He said the false identification appeared to be a California driver's license. Welch could not identify the residence where the false identification was manufactured or the person who manufactured it.

///

///

**Testimony of Jonathan Ross**

10

Jonathan Ross testified he had a false identification made in 2007 in order to buy alcohol even though he was underage. Ross learned about a local manufacturer of false identification cards through his high school friends. Ross went alone to a home in the Bullard and West area of Fresno. He entered the home through an open garage door and saw a man waiting for him. The man took down Ross's personal information and then took his photograph. The man manufactured two identification cards because the first card was damaged when it came out of the printer. Ross paid the man about $150 for the false identification cards and kept both of them. Ross could not identify the maker of the cards at trial.

**Testimony of Leonard Aguilar**

Leonard Aguilar testified he had a false identification made in 2007 "[t]o have 21-and-over privileges." He learned about the manufacturer of false identification cards through a friend. Aguilar and his friend went to the manufacturer's home and entered the garage. The man who manufactured identification cards was present in the garage. He took Aguilar's photograph and generated a card for about $150. The card was later confiscated at a bar. At trial, Aguilar could not identify the man who manufactured the card.

**Testimony of John J. Amparano**

John Amparano testified he obtained a fake identification in 2007 "to get in the clubs" at a time he was under age 21. Amparano said he was a friend of Kristen Larsen, and Larsen showed an identification to get beer at a restaurant. Amparano knew that Larsen was also underage and he asked her about the card. Larsen told Amparano, "Oh, I know this person, this guy, and he does this." Larsen eventually took Amparano to a home in northwest Fresno. A blonde-haired friend of Larsen also went with them. Larsen called ahead and the trio parked near the house. They entered the open garage of the home and met the man who manufactured false identifications. Amparano described the garage as "a little miniature DMV setup," including a blue background for picture-taking, a camera, and computer. Amparano paid $150 or $200 for his false identification, and the man generated a card.

Amparano said he went to the home a second time with his friends, "Mike 'Antaneno' and 'Vermel.'" The two friends struck up a conversation with the man about his other activities, including false social security and credit cards. Amparano said the man "didn't want us to know about that stuff. We're too young." Amparano said a detective showed him a six-photo lineup in June 2008 and Amparano selected a picture of the man who manufactured his identification card. At trial, Amparano said [Petitioner] was the maker of his false identification card.

**Testimony of Firebaugh Police Officer Magda Martinez**

Firebaugh Police Officer Magda Martinez testified a Gabriel Bautista contacted her at 2:12 p.m. on November 29, 2007. Bautista reported there had been unauthorized charges on his credit card and one of those charges had been made at the Wal-Mart store in Clovis. Officer Martinez's assisting officer, Officer Valdez, had previously worked at Wal-Mart and was aware that security videos were kept for a period of time. Martinez contacted the assistance manager of the Clovis Wal-Mart, advised her of the investigation, and Martinez and Valdez were able to retrieve the video for the time of the transaction. The Firebaugh

11

officers turned that video over to the Fresno Police Department, where Detective Dodd later retrieved it. The prosecution played the Wal-Mart video for the jury, and the court admitted a still photograph from that video.

Martinez reviewed her report at trial and said that someone had made five unauthorized purchases using Bautista's credit card information. Those purchases took place between 1:21 and 2:46 p.m. on November 27, 2007. The purchases occurred at Best Buy, Wal-Mart, Starbucks, Subway, and Pets-Mart.

**Testimony of Fresno Police Detective George Irmerian**

Fresno Police Detective George Irmerian testified he assisted in the service of the search warrant in [Petitioner's] Browning Avenue home on December 13, 2007. Detective Irmerian searched the dining room area, found a shredder in the dining room, and saw shredded documents inside the machine. Irmerian pointed out the material to Detective Dodd, and Dodd asked him to collect the shredded paper.

**Testimony of Fresno Police Detective David P. Passmore**

Fresno Police Detective David Passmore testified he assisted in the service of the search warrant at [Petitioner's] Browning Avenue home on December 13, 2007. Passmore searched the master bedroom and found multiple USB thumb drives on the post of a four-poster bed.

**Testimony of Fresno Police Detective Terry A. Terry**

Fresno Police Detective Terry Ann Terry testified she worked in the Financial Crimes Unit and assisted in the search of [Petitioner's] home on December 13, 2007. Detective Terry and her colleague, Detective Castillo, searched the garage area of the home and found one tripod inside the garage and one tripod outside the garage. She also found a wallet on a countertop in the kitchen.

**Testimony of Fresno Police Detective Heather Ground**

Fresno Police Detective Heather Ground testified she worked in the Financial Crimes Unit and assisted in the search of [Petitioner's] home on December 13, 2007. She returned on December 14, 2007, with Detective Ken Dodd and Suzette Jumper. The trio went to the master bedroom and looked for a laptop computer that was concealed inside of a video cassette recorder (VCR). The detectives found and seized the item. [Petitioner] was not present at his home during the search on December 14, 2007. Detective Ground understood that Suzette Jumper and her children also lived in the home. Ground said that Detective Dodd recovered an Xbox game console because Jumper said that was one of the items purchased with a stolen credit card number during a shopping trip that Jumper shared with [Petitioner]. Jumper said she accompanied [Petitioner] on other shopping trips where he used other people's credit card numbers to purchase household items.

///

///

**Testimony of Correctional Officer Joe Papagni**

Joe Papagni testified he was a correctional officer with the Fresno County Sheriff's Department and was familiar with the phone system in the Fresno County Jail. Officer Papagni said inmates are allowed to place outgoing phone calls from the jail and that such calls are recorded. At the beginning of each call, the parties are admonished that the call is being recorded and the receiving party must accept the charges. Inmates are assigned a jail identification number (JID) and an inmate who makes an outgoing call must enter his or her JID to make the call. [Petitioner's] JID was 0282026 and a printout indicated his JID was used to make outgoing calls on August 7, 2008, at 4:53 p.m., August 11, 2008, at 6:34 p.m., and August 12, 2008, at 5:11 p.m. Detective Dodd, who had spoken with both [Petitioner] and Suzette Jumper, believed the recordings contained the voices of [Petitioner] and Suzette Jumper.

**Testimony of Jerica Means**

Jerica Means testified she had a false California driver's license made in 2007 to go out to bars even though she was under age 21. A friend had a false identification and gave Means the phone number of the person who manufactured it. Means called the individual and then went to his home with her friend, Bob Sullivan. Means and Sullivan entered the man's garage. Means stood in front of a blue backdrop and had her picture taken. The man generated two false identification cards, and Means paid him for the cards. She gave one of the cards to a Fresno police detective in 2008. During her conversation with the detective, Means identified the man who made her identification cards from a photo lineup. She was unable to identify that person at trial. Detective Dodd testified he spoke with Means in June of 2008, showed her a photo lineup, and said she picked [Petitioner's] photograph.

**Testimony of Senior Investigator Linda Sue Brock**

Linda Sue Brock testified she was a senior investigator with the Fresno County District Attorney's Office. She testified that [Petitioner] was arrested on December 13, 2007, and released the next day. He was taken into custody a second time on or about August 4, 2008. Investigator Brock testified that Detective Dodd brought her a box of shredded documents that was seized at [Petitioner's] home pursuant to a warrant in December 2007. Brock testified, "[I]t was decided that I would look at pretty much every single piece of paper in this bag to see if I could find anything of evidentiary value to it." She said the district attorney's office had the records of victims listed in the amended information and a list of unauthorized credit card charges. She looked through the shredded paper for receipts that might match the unauthorized charges. In doing so, she realized certain store receipts had unique characteristics, such as the font color and style of wording. Brock was able to compare and match information on shredded partial receipts with the names of victims in the amended information and unauthorized charges on the list of such charges.

Brock testified she investigated Suzette Jumper and her four then-minor children. She said the children were born in Fresno County and their certificates of birth listed the mother's maiden name as "Suzette Marie Allan." Brock explained that all births are registered in the mother's name.

Brock confirmed the office of the district attorney made plea deals with Jessica Baldwin and Nolan Fitzpatrick for their truthful testimony. She said the district attorney's office made no other deals with witnesses. Brock said she had multiple conversations with Phong Tran and recorded at least one of them.

At the conclusion of Brock's testimony, the prosecution played for the jury a number of recordings of phone calls [Petitioner] made after his arrest and incarceration in Fresno County Jail. The recordings included one conversation between [Petitioner] and his girlfriend/wife, Suzette Jumper. The court admitted the tape recordings into evidence.

## Defense Evidence

### Testimony of B.J.

[Petitioner's] stepdaughter testified Detective Dodd and other officers served a search warrant at her house on December 13, 2007. The officers entered the house and asked whether [Petitioner] was present. She told officers she did not know because she had just awakened. She said Detective Dodd jammed his flashlight into her chest, pushed her against the wall, told her not to touch her dog, and ordered her to stay against the wall. They later seated her in the kitchen. She said Dodd did not show her a warrant before officers searched the residence.

The stepdaughter testified that Phone Tran had frequently entered [Petitioner's] home with permission and had used [Petitioner's] computer and paper shredder. He entered the house several times a week and was sometimes alone in the house. She said Tran always had a flash drive in his possession. Tran's flash drive was black with white lettering. She said [Petitioner] always had one of his flash drives on a lanyard with his keys. He had another flash drive that was not on a lanyard. She never saw Tran shred documents in her home but did hear the shredder operating while he was on the premises.

The stepdaughter said she lived with [Petitioner] and her mother beginning in 2004 or 2005. At that time, he worked as an on-call driver for a towing company and later became a crane operator. She was unaware that [Petitioner] was making false identifications in the family garage for underage drinkers. She said she did not see a blue blackdrop or other photographic paraphernalia in the garage. She said her mother and [Petitioner] went shopping for household items, but she did not see [Petitioner] going on spending sprees and buying and bringing home lots of items. She said she did not pay attention to how [Petitioner] paid for items when she went shopping with him. She testified she was unaware that money was being paid in the family garage for false identifications.

### Testimony of Suzette Marie Jumper

Suzette Jumper initially testified she was living with [Petitioner] during the period in question. After conferring with independent counsel, she invoked her privilege against self-incrimination under the Fifth Amendment and declined to testify as a defense witness.

### Testimony of Detective Ken Dodd

Testifying during the defense case, Detective Dodd said he did not conduct any scientific analysis of the jailhouse recordings and said in his opinion the voice of [Petitioner] was on the jailhouse phone recordings. Detective Dodd testified that a majority of the officers wore gloves during the search but no one took fingerprints or photographed evidence found in its original state. Dodd acknowledged he did not have training in credit card data, such as information on a magnetic strip. Dodd acknowledged that officers seized credit and debit cards and certain cards that had both debit and credit features. Dodd said he did not

14

take the credit cards from [Petitioner's] wallet to a specific examiner to verify that a particular encoding machine had been used to encode cards.

Dodd confirmed that the Visa card of Kevin Hurley was used at a Best Buy store without his authorization on November 7, 2007, to purchase a Sunpak 7500 TM and that a similar tripod was found at [Petitioner's] home. Dodd also testified that a credit card of the late Patricia Peterson was used at a Best Buy store without her authorization on August 18, 2007 to purchase an MT 3422 laptop computer and that Jessica Baldwin surrendered a similar laptop to Dodd. Baldwin told Dodd the laptop was the computer that [Petitioner] purchased for her. In Dodd's opinion, [Petitioner] either acquired third party credit card numbers and then made unauthorized charges or aided and abetted others by creating credit card gift cards so that those others could use them to make unauthorized purchases.

Dodd testified the Fresno Police Department has a credit card reader that analyzes the magnetic strip on a card and sets out the account number on a screen. Several credit cards were in [Petitioner] wallet, and Dodd slid them through the reader. One of the cards had no encoded account number that matched the number embossed on the front of the card. Other cards bore [Petitioner's] embossed name but yielded account information for three Red Robin customers of Jessica Baldwin.

Detective Dodd testified that [Petitioner's] cell phone contained incoming text messages from Tran and Casper. In Dodd's opinion, those messages were consistent with someone engaging in credit card skimming.

**Testimony of Rick Barclay**

Barclay testified he was a licensed private investigator working for the defense. Barclay said Detective Dodd's references at trial to a residence at 1465 West Browning Avenue were inaccurate because no such address existed.

Barclay said he had made efforts to locate Phong Tran. He also testified a website known as "FresnoSheriff.org" sets forth jail identification numbers for inmates and that the public has access to such information. Barclay acknowledged the Fresno County jail issued a printout of calls made from the jail and the phone numbers to which calls were made. Barclay said he did not investigate the phone number called under [Petitioner's] jail identification number. Barclay said he generally called Suzette Jumper on her cell phone and not a home phone.

**Testimony of Arnold Martinez**

Arnold Martinez testified he had been the manager of the Red Robin restaurant in River Park for five years. Martinez said he had employed Jessica Baldwin for between eight months and one year. Martinez said he carries a magnetic card that allows the holder to provide "comps or voids or [to] look up tables in a restaurant." He also said the card would enable the holder to reprint a guest's check. Martinez said he never gave Jessica Baldwin permission to have a manager's access card. He said magnetic cards are not given to team members. A team member with such a card could manipulate the work clock and add more hours for payroll purposes. Martinez had no evidence that Baldwin used a manager's access card to steal money or over report work hours. To the best of Martinez's recollection, Baldwin failed to report for work and "typically if we

15

don't hear from a team member or an employee in a certain amount of time, they terminate themselves by not coming into work or calling." Martinez did not know the reason why Baldwin failed to report for work.

**Testimony of Anthony Sciola**

Anthony Sciola, the owner of Campagnia Restaurant, testified that Tran and his brother, Bay Tran, worked for him as servers. Phong Tran worked for him for three to five years. He fired Tran and his brother after customers reported suspicious activities on their credit accounts after using their credit cards at Campagnia. Sciola said he reprinted the bills of the two customers, noticed that the servers were Phong and Bay, and received a few calls after those incidents. Sciola said those facts "kind of throw a red flag up," and Sciola thought something suspicious was going on. The two brothers were terminated, and the restaurant had no other problems with fraudulent activity. Sciola did not know whether Phong skimmed credit cards at the request of [Petitioner]. Sciola did not know [Petitioner] or know that he was Phong's neighbor.

**Testimony of Sherri Ann Persons**

[Petitioner's] sister, Sherri Ann Persons, testified she gave [Petitioner] permission to use her Target Visa card to purchase bedroom furniture and [a] big screen television. She further testified she gave [Petitioner] permission to use the card to place a deposit on a Harley Davidson motorcycle. She said [Petitioner] made monthly payments on the card for these purchases. Persons said the big screen was purchased legally at Best Buy and that she was present at the time of purchase. Persons said she had twice been to the Browning Avenue home that [Petitioner] shared with Suzette Jumper. On one occasion, Persons attended a Halloween party in the garage and there were between 20 and 25 guests present. She said the guests had access to all of the rooms of the house.

Persons said her credit card had a limit of $9,000, and the highest balance that [Petitioner] incurred was between $5,000 and $7,500. Persons said her credit card number was changed after [Petitioner's] arrest because the card company considered her a victim based on evidence that [Petitioner] had possession of her card.

**Testimony of Phong Tran**

After conferring with independent counsel, Tran invoked his privilege against self-incrimination under the Fifth Amendment and declined to testify as a defense witness.

**Rebuttal Evidence**

Linda Brock testified she ran [Petitioner's] name through a secured law enforcement website called Accurint. According to Accurint, the two recorded outgoing calls at the Fresno County jail were made to a telephone number associated with [Petitioner].

(Ex. A at 3-26.)

**DISCUSSION**

16

1    I.     Jurisdiction

2          Relief by way of a petition for writ of habeas corpus extends to a person in custody

3    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

4    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

5    529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

6    guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County

7    Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

8    U.S.C. § 2241(d).

9          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

10   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

11   enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

12   (9th Cir. 1997), cert. denied, 522 U.S. 1008 (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th

13   Cir. 1996).  The instant petition was filed after the enactment of the AEDPA and is therefore

14   governed by its provisions.

15   II.    Standard of Review

16         Where a petitioner files his federal habeas petition after the effective date of the Anti-

17   Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

18   the state court's adjudication of his claim:

19        (1) resulted in a decision that was contrary to, or involved an unreasonable
          application of, clearly established Federal law, as determined by the Supreme
20        Court of the United States;
          or
21        (2) resulted in a decision that was based on an unreasonable determination of the
          facts in light of the evidence presented in the State court proceeding.
22

23   28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d)

24   unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

25   established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct.

26   770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412

27   (2000).  Habeas relief is also available if the state court's decision "involved an unreasonable

28   application" of clearly established federal law, or "was based on an unreasonable determination

17

of the facts" in light of the record before the state court. <u>Richter</u>, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. <u>Richter</u>, 131 S.Ct. at 786; <u>Knowles v. Mirzayance</u>, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. <u>Premo v. Moore</u>, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Richter</u>, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. <u>See</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Richter</u>, 131 S.Ct. at 784.

///

///

III.   <u>Shackling During Trial</u>

18

1    Petitioner contends the shackling during trial violated his state and federal constitutional

2  rights to counsel and due process.

3    Petitioner raised this claim to the California Court of Appeal, Fifth Appellate District

4  which denied the claim in the last reasoned decision. The appellate court set forth the lengthy

5  procedural background regarding this claim stating:

6      [Petitioner] represented himself at trial. On January 12, 2010, the first day
       of trial, the prosecutor noted that [Petitioner] was shackled in the courtroom and
7      the court observed, "[t]hat would be a problem" in an anticipated six-week trial.
       The court asked a deputy sheriff whether there was a need to keep [Petitioner]
8      shackled. The deputy responded, "Yes, that is the standard operating procedure,
       your Honor. The defendant or the Court can request that [the shackles be
9      removed] and I have to run it through chain of command to run his background to
       clear him...." The court indicated it was unaware of anything in [Petitioner's]
10     criminal record that would suggest a reputation for violence or similar behavior.
       The court also suggested that two deputies might be assigned to the courtroom and
11     asked the deputy who was present to look into that possibility. The court,
       prosecutor, and [Petitioner] discussed the defense's use of the "Elmo" overhead
12     machine in the courtroom, and the court suggested that [Petitioner's] courtroom
       assistance, Rick Barclay, could operate the machine so that [Petitioner] would not
13     have to move and reveal his shackles to the jury.

14        On the afternoon of January 12, 2010, the court addressed [Petitioner's] in-
       custody status, noting: "We normally try not to give that information to the jury. In
15     a six-week trial, it may become obvious to them that you are in custody. I don't
       know if you want to disclose that information to them, let them know it."
16     [Petitioner] asked whether it would be easier if he simply disclosed his in-custody
       status. The court replied, "Sometimes attorneys think it is better to let them know.
17     They're going to figure out anyway, probably. They never see you walk outside.
       You are always going to be seated." [Petitioner] said he was trying to keep his feet
18     under the desk "but you can still see." The court advised "we're going to remove
       the restraining device." As to disclosure of in-custody status, the court said, "I will
19     leave it up to you, sir." [Petitioner] said, "I will work it in, not right at the
       beginning, but I will, I will work it in." The court then said, "Okay. Need to do it
20     during the voir dire, sir." The court explained he did not want [Petitioner] "to be in
       the middle of the trial then bring it in for some reason."

21

22        During a recess in the voir dire, the court held proceedings outside the
       presence of the prospective jurors. Deputy Cristo of the Fresno County Sheriff's
23     Office said his office had checked [Petitioner's] background and determined
       [Petitioner's] past crimes were property crimes that did not involve violence.
24     Cristo said his office was not opposed to having [Petitioner] "quietly covered."
       The court explained that [Petitioner] wanted to be "undone" once the trial itself
25     started. Cristo said, "[W]e are not going to oppose him being completely
       unrestrained." However, Cristo did ask the court to impose "some sort of
26     restrictions on movement." The court suggested the only movement would occur
       when [Petitioner] "has to come up to the bench at all." Cristo asked that
27     [Petitioner] "not approach the well, the clerk, and limited approach on the jury."
       The court suggested, "He would just come up here so we can discuss whatever
       issues might come up, but we would not step outside the courtroom."

28

Deputy Cristo then said, "Well, we would ask if he does approach, if he comes close to the bench, that a deputy sheriff be right with him for the obvious security reasons."  The court observed:

> "Sure, I thought you would say that.  That creates some issues themselves. [¶] It may be better [that] if an issue arises that I ask the jury to step out and we can address the issues and come back in, otherwise, I think it is too cumbersome and it would probably be prejudicial, because it would appear that he is somewhat dangerous, and that is the last thing I want. [¶] Mr. Matteson, I think we will have to leave you shackled, sir, and if we have an issue come up, I will have to ask the jurors to leave."

[Petitioner] then asked the court whether he could have just one leg shackled, rather than two "because it creates the issue of them being able to see behind me...." Deputy Cristo did not oppose that solution and the court said, "We can do that for the trial."  The court said, "We can do that.  Why don't we go ahead and unshackle one leg and seal the shackle."  Cristo said, "Judge, if the issue does come up where Mr. Matteson needs to move around, present evidence, he would just ask and we would provide another deputy sheriff in the courtroom for extra security." Cristo also reiterated, "Let me make sure I understand you correctly.  He will be covered.  If he needs to move, we will bring out an extra body?"  The court answered in the affirmative.

During his opening statement, [Petitioner] said of the prosecutor:

> "And she's only got to convince one of you that I'm guilty. I've got to convince all 12 of you that I'm not guilty.  And her statements are–everything is supposed to be that you are presumed innocent until you are proven guilty.  But the true fact is, you are guilty and you must prove your innocence.  If that theory was true, what you hear, would I not be seated, chained to the desk right now, if I was already proven innocent and then guilty from there (indicating)?"

The prosecutor interposed an objection and the court advised the jury:

> Ladies and Gentlemen, I will have to say something here. Mr. Matteson has just let you know that he is presently in custody, and that is true.  I mean, he obviously is shackled.  His choice was to let you know early on that he has not made bail, he has not been released on his own recognizance.  And if he wants to let you know at this time, for whatever reasons, it may benefit him.

> "Another thing, too, is he is absolutely wrong about the District Attorney convincing one person and that is the end of the case.  The People have to convince all 12 of you that he is guilty of any particular charge.  And if they can't do that, that is the end of it. And he is presumed innocent.  He is not presumed guilty.  That is the law, Mr. Matteson is absolutely wrong on those accounts."

At the conclusion of the opening statements, the court further advised the jury:

> "I have to say something else about Mr. Matteson's

20

custodial status.  It was discussed earlier outside your presence, it's
always a concern when someone is in custody and can't freely move
around the courtroom.  We discussed a way to free Mr. Matteson.
Since he has not posted bail, he is in custody, obviously.  We would
have two deputies here.  That is mandated by the sheriff's office,
that we have to have two deputies if someone is in custody.  And
Mr. Matteson was gracious enough to say, you know, that is okay,
he can remain like this.  At some point, he let you know he was in
custody.  I had not anticipated it would come up this way.  His
custody status is not relevant to the issue of guilt or innocence.  It is
just a reality that some people can't make bail.  And he couldn't
make bail.  But I don't want it to reflect on one side or the other.  It
is just reality.  He is in custody, and you have learned he is in
custody and that is just the way it is.  And, again, I said he was
gracious in agreeing to that, because otherwise we would have to
have another deputy here.  And I guess you are aware of the
sheriff's office situation, they're having budget problems, and it is
helpful that someone agrees to just do what he did."

[Petitioner] concluded his closing argument, by stating: "[W]hen you leave
this courtroom after all the decision have been made, you go back to your families,
you go back to your jobs, life as usual, everything goes on.  The prosecutor goes on
to her next case, her next commission.  When I walk out of this courtroom, I'm
looking at 77 years in prison."  The court admonished [Petitioner] and advised the
jury: "[S]entencing is strictly for the court.  You are not to consider the question of
punishment."

At the conclusion of all the evidence and arguments, the court instructed
the jury with CALCRIM No. 204 [defendant physically restrained] as follows:

"The fact that physical restraints have been placed on the
defendant is not evidence.  Do not speculate about the reason.  You
must completely disregard this circumstance in deciding the issues
in this case.  Do not consider it for any purpose or discuss it during
your deliberations."

After the jury rendered its verdicts, Juror No. 27 advised the
court: "[I]t is just very hard to issue the verdict.  And I would plead
for you to have leniency on the amount of time the defendant has to
serve."  The court responded, "I know Mr. Matteson made a
comment that he ought not to have made when he was arguing.  As
I remind you, sentencing is for the Court."

(Ex. A at 40-43.)

After citing the relevant California law, the appellate court ruled as follows:

[Petitioner] contends the trial court abused its discretion by shackling him
"despite a specific finding of no manifest need and without consideration of less
restrictive alternatives."  (Initial capitalization omitted.)  Respondent concedes the
trial court "failed to base its decision on 'manifest need' to shackle [Petitioner] in
particular," although the court did conduct an individualized analysis of
[Petitioner's] situation and determined he did not have a history of violence.  The
trial court ultimately directed the unshackling of one of [Petitioner's] legs afer
[Petitioner] noted "it [shackling of both legs] creates the issue of [the jurors] being

21

able to see behind me[.] At least [with] one [leg shackled], I can take one leg, one leg tucked back."

        The Supreme Court has "consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson, supra*, 25 Cal.4th at p. 596.) The record on appeal does not indicate that the jurors knew [petitioner] was restrained prior to his informing them of the single leg restraint during the course of his opening statement. Nor does the record suggest that the jurors were otherwise prejudiced against him. As respondent points out, "a party cannot profit by his or her own wrongdoing," i.e., in this case [Petitioner's] mentioning of the leg restraint to the empaneled jurors after the court and court security personnel took numerous precautions and steps to enable him to present his defense in propria persona without revealing any physical restraints. (*In re Hamilton* (1999) 20 Cal.4th 273, 305.)

        Although the trial court erred in failing to find a "manifest need" for the shackling of [Petitioner], as set forth in *Pride*, that error was not prejudicial where there is no evidence that the jury was aware of the restraint prior to [Petitioner's] opening statement, the court explained the presence of the restraint immediately after [Petitioner] made his opening statement, and the court admonished the jury–at the conclusion of the evidence–not to consider the presence of the restraint for any purpose.

        The trial court did not commit reversible error by allowing [Petitioner] to be shackled in the presence of the jury.

(Ex. A at 45-46.)

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that are not justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005), accord Williams v. Woodford, 384 F.3d 567, 591 (9th Cir. 2004); Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999). Nonetheless, the Ninth Circuit has concluded that failure to object to shackling at trial "constitute[s] a waiver of the issue." See King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992) (citing Estelle v. Williams, 425 U.S. 501, 512-513 (1976)). Moreover, a shackling claim brought on federal habeas corpus is subject to harmless error analysis under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Thus, even if it was erroneous to shackle a defendant, the Court must determine under Brecht whether the shackling had a substantial and injurious effect on the verdict. Duckett v. Godinez, 67 F.3d 734, 749 (9th Cir. 1995).

Here, although the trial court erred in failing to make the determination of a "manifest need" for the use of restraints, Petitioner has not demonstrated that he suffered any prejudice. In

1   <u>Dyas v. Poole</u>, 317 F.3d 934, 937 (9th Cir. 2003), it was conceded the defendant was

2   unconstitutionally shackled during trial, and the Ninth Circuit held there was prejudice because at

3   least one juror saw the shackles in the courtroom during trial, the defendant was charged with a

4   violent crime which increased the risk that the shackles branded her as having a violent nature,

5   and the evidence was not overwhelming.  <u>See also</u> <u>Rhoden v Rowland</u>, 172 F.3d 633, 637 (9th

6   Cir. 1999) (habeas corpus relief warranted where at least some of the jurors saw the shackles

7   which essentially brandished defendant as having a violent nature in a case where his propensity

8   for violence was a crucial issue and evidence indicated the shackles caused defendant physical and

9   emotional pain during trial.)   To determine whether the imposition of visible physical restraints

10  amounts to prejudicial error, the reviewing court shall consider the appearance and visibility of the

11  restraining device, the nature of the crime with which the defendant was charged, and the strength

12  of the State's evidence against the defendant.  <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1063 (9th Cir.

13  2008).

14          In this case, the single leg restraint only became visible to the jurors when Petitioner made

15  specific reference to it during his opening statement and attempt to use it in his favor.  The

16  appellate court properly reasoned that Petitioner cannot "profit from his own" wrongdoing.

17  <u>Illinois v. Allen</u>, 397 U.S. 337, 345 (1970).  Contrary to Petitioner's claim, there was no evidence

18  that the jury was aware of the concealed restraint at the time he disclosed it during his opening

19  statement.  The trial court immediately sustained the prosecutor's objection and informed the jury

20  that Petitioner had "simply not made bail" and had "not been released on his own recognizance."

21  (RT 731-732.)  The court further explained that Petitioner was gracious enough to agree to the

22  restraint because otherwise it was mandated by the sheriff's department that two deputies be

23  present.  (RT 731.)  After the close of evidence, the court specifically instructed the jury with

24  CALCRIM No. 204 which explained, *inter alia*, that the physical restraints placed on Petitioner

25  was not evidence and the jury was to disregard it in determining his guilt. (RT 1974.)  The jury is

26   presumed to follow the court's admonitions.  <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)

27  (noting that "almost invariable assumption of the law that jurors follow their instructions").

28          Petitioner contends that his ability to represent himself during trial was compromised

1   because of the shackling.  Petitioner fails to provide any support for his conclusory allegation.

2   Petitioner reasons that because the prosecutor stood and faced the jury during voir dire and

3   opening and closing arguments, he was prejudiced by having to sit during the entire trial.

4   However, as just stated, it was Petitioner himself who decided to make the jury aware of the single

5   leg shackle, and he cannot now claim prejudice by his own wrongdoing.  During voir dire,

6   Petitioner expressed his intent not to testify at trial which was prior to the shackling issue and the

7   restraint could not have deterred or dissuaded him from testifying.  (RT 696.)  Furthermore, the

8   transcript of the trial reveals that Petitioner thoroughly represented himself during the trial and he

9   presents no specifics as to how the single leg restraint prevented him from doing so.  Thus, there

10  is no basis for concluding that the restraints compromised Petitioner's ability to voir dire

11  respective jurors, to make his opening and closing statements, to lodge objections, and to question

12  witnesses.  Petitioner never complained to the Court that he was unable to effectively represent

13  himself because of the restraints and the trial court agreed to accommodate Petitioner if

14  unshackling was necessary.  Moreover, even if Petitioner had been unrestrained, the trial court

15  could have reasonably decided he should not freely roam the courtroom but rather should stay at

16  the counsel table or the witness stand.  Petitioner has not cited nor is this Court aware of any

17  clearly established Supreme Court authority that requires a trial court to give a self-representing

18  defendant unfettered access to all areas of the courtroom.

19          Petitioner further reasons the jury likely speculated that he was a violent person.

20  However, Petitioner was not charged with a violent crime and absent such charge there was no

21  increase in potential prejudice to Petitioner by use of the shackles.  In fact, because Petitioner was

22  charged with identify theft (a nonviolent offense) it is reasonable to assume the jury believed him

23  to be a nonviolent person.

24          Contrary to Petitioner's contention, the trial court did not state that the jurors observed

25  Petitioner in leg shackles.  Rather, the trial court acknowledged that they may have been able to

26  see the restraints only after Petitioner had called it to the jury's attention and there was no finding

27  that any juror actually observed the shackles.  The trial court informed Petitioner that in a six-

28  week jury trial it may become obvious to jury that Petitioner was in custody and some counsel

1 chose to strategically disclose this fact to the jurors during voir dire.  (RT 704-705.)   The court

2 specifically told Petitioner that it was up to him to determine whether he wished to disclose such

3 fact to the jury.  (RT 705.)

4       Finally, there was overwhelming evidence of Petitioner's guilt.  Petitioner was charged

5 and convicted of 48 counts of unauthorized use of personal identifying information each involving

6 a different victim. The evidence at trial revealed that each of the victims debit or credit card

7 account information was found at Petitioner's home, Petitioner did not have permission to use the

8 victim's account information, and there were unauthorized charges on their accounts.  (See RT

9 1103-1121, 1141-1147 [count 15], 1151-1155 [count 5], 1155-1159 [count 33], 1163-1166 [count

10 10], 1180-1186 [count 7], 1186-1192 [count 3], 1192-1195 [count 32], 1201-1203 [count 25],

11 1207-1211 [count 16], 1260-1266 [count 45], 1266-1272 [count 44], 1296-1305 [count 2], 1311-

12 1316 [count 18], 1317-1321 [count 23], 1321-1326 [count 6], 1359-1364 [count 48], 1366-1372

13 [count 24], 1372-1376 [count 12], 1378-1381 [count 29], 1388-1390 [count 37], 1394-1399

14 [count 22], 1410-1412 [count 19], 1418-1423 [count 13], 1446-1452 [count 9], 1460-1465 [count

15 27], 1466-1470 [count 28], 1471-1473 [count 14], 1479-1483 [count 40], 1484-1492 [count 1],

16 1520-1524 [count 31], 1530-1534 [count 39], 1535-1538 [count 46], 1539-1542 [count 30], 1546-

17 1550 [count 17], 1557-1560 [count 26], 1567-1570 [count 34], 1593-1598 [count 11], 1609-1613

18 [count 42], 1614-1618 [count 20], 1632-1637 [count 8], 1663-1667 [count 38], 1682-1685 [count

19 47][3], 1685-1691 [count 36], 1705-1708 [count 35], 1741-1743, 1746 [count 41].)

20       Twenty-six of the victims had their cards used at the Red Robin restaurant in the River

21 Park area of Fresno in the summer and fall of 2007-prior to the dates of the unauthorized charges

22 made on their accounts, i.e. August to December of 2007.  See RT 1103-1121, 1141-1147 [count

23 15], 1151-1155 [count 5], 1163-1166 [count 10], 1180-1186 [count 7], 1207-1211 [count 16],

24 1260-1266 [count 45], 1266-1272 [count 44], 1296-1305 [count 2], 1311-1316 [count 18], 1317-

25 1321 [count 23], 1321-1326 [count 43], 1332-1337 [count 4], 1352-1357 [count 6], 1359-1364

26

27     [3] On appeal, the State conceded that Jill Gonzales (the victim in count 47) identified her card number found in Petitioner's possession, but did not testify that there were unauthorized charges on her account.  Thus, this conviction was reversed.

28

[count 48], 1366-1372 [count 24], 1446-1452 [count 9], 1471-1473 [count 14], 1479-1483 [count 40], 1484-1492 [count 1], 1530-1534 [count 39], 1546-1550 [count 17], 1593-1598 [count 11], 1609-1613 [count 42], 1614-1618 [count 20], 1632-1637 [count 8], 1682-1685 [count 47].)

Petitioner was also charged and convicted of manufacturing deceptive identification documents (counts 50 to 58).  Several underage witnesses testified that they went to Petitioner's home and obtained false identifications from him.  (See RT 739-745, 768-812, 1196-1199, 1272-1278, 1283-1288, 1424-1427, 1434-1445, 1695-1698.)

In Counts 59 through 110, Petitioner was charged with the related crime of theft of access card account information.[4]  Each victim again identified their credit or debit card account information and confirmed the account numbers found at Petitioner's home belonged to them.  It was determined that thirty-one of the victims had eaten at the River Park Red Robin restaurant in the summer and fall of 2007-at the time Baldwin was working there.  (See RT 1103-1121, 1148-1150 [count 95], 1160-1162 [count 77], 1204-1206 [count 105], 1246-1249 [count 79], 1250-1254 [count 81], 1254-1259 [count 62], 1280-1282 [count 102], 1288-1292 [count 96], 1292-1295 [count 59], 1327-1331 [count 65], 1346-1349 [count 101], 1385-1387 [count 99], 1414-1417 [count 110], 1453-1456 [count 97], 1456-1459 [count 87], 1494-1498 [count 86], 1498-1501 [count 104], 1503-1506 [count 90], 1509-1513 [count 94], 1516-1520 [count 92], 1543-1545 [count 98], 1552-1556 [count 60], 1561-1565 [count 68], 1586-1589 [count 88], 1589-1593 [count 91], 1599-1602 [count 100[, 1605-1608 [count 85], 1627-1630 [count 93], 1676-1678 [count 103], 1679-1682 [count 61], 1691-1694 [count 80].)  Nine of the victims used their cards at Goldfield's restaurant at the Chukchansi Casino in 2007 when Fitzpatrick was skimming cards. (See Rt 1103-1121, 1382-1384 [count 69], 1391-1393 [count 78], 1525-1527 [count 67], 1527-1529 [count 70], 1582-1585 [count 83], 1603-1604 [count 82], 1700-1701 [count 64], 1702-1702 [count 72], 1709-1711 [count 66].)  The remaining eight victims verified their account numbers were found in documents seized from Petitioner's home.  (RT 1103-1121, 1212-1214 [count 106], 1234-1241 [count 74], 1350-1351 [count 108], 1357-1359 [count 76], 1430-1434 [count 71],

---

[4] The prosecution dismissed counts 63, 73, 75, and 84, so those counts are not discussed.

1  1476-1478 [count 89], 1507 [count 107], 1514-1516 [count 109].)

2      Furthermore, the jury deliberated for just over three hours (with readback of Nolan

3  Fitzpatrick's testimony for 13 minutes), which strongly supports the inference that the case against

4  Petitioner was clear-cut. (CT 746-748); see e.g. Gibson v. Glanon, 633 F.2d 851, 855 n. 8 (9th

5  Cir. 1980) (the length of deliberations has been cited as a factor in determining whether the

6  State's case was strong, citing Parker v. Gladden, 385 U.S. 363, 365 (1966) (26 hours) and

7  Dallago v. United States, 427 F.2d 546, 559 D.C. Cir. 1969) (5 days).)

8      Given that Petitioner himself disclosed the fact of the hidden leg restraint to the jury, the

9  evidence against him was overwhelming, and Petitioner was not charged with a violent offense,

10  any error did not have a substantial and injurious impact on the jury's verdict, and the appellate

11  court's determination of this issue was not contrary to, or an unreasonable application of, clearly

12  established Supreme Court precedent, and habeas corpus relief is foreclosed.

13  IV.    Insufficient Evidence

14      Petitioner contends that there was insufficient evidence to support his convictions of

15  identity theft in counts 1-6, 8, 10-13, 14-18, 20, 22-40, and 45-48 because the prosecution failed

16  to prove he "actually used" the information to defraud the victims.

17      In the last reasoned decision, the California Court of Appeal, Fifth Appellate District

18  denied the claim stating as follows:

19          [Petitioner] specifically argues:

20          "Mr. Matteson concedes that the evidence was sufficient to sustain
           convictions as to the first group of charges–counts 7, 9, 14, 19, 21, 41, 42, 43 and
21          44.  But ... the evidence was insufficient to sustain a conviction as to the remaining
           two groups of charges–counts 1, 2, 3, 4, 5, 6, 8, 10, 11, 12, 13, 15, 16, 17, 18, 20,
22          22, 23, 24, 25, 26, 27, 28, 29, 30, 21, 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 46, 47
           and 48–because the state did not prove beyond a reasonable doubt that Mr.
23          Matteson was connected to the unauthorized charges.  Reversal of these counts is
           required."

24

25          **B. Section 530.5, subdivision (a)**

26          Counts 1 through 48 of the first amended information charged [petitioner]
27          with separate violations of "Penal Code Section 530.5(a), a felony."  Section 530.5,
           subdivision (a) states:

28

1    "Every person who willfully obtains personal identifying information, as
     defined in subdivision (b) of Section 530.55, of another person, and uses that
2    information for any unlawful purpose, including to obtain, or attempt to obtain,
     credit goods, services, real property, or medical information without the consent of
3    that person, is guilty of a public offense, and upon conviction therefor, shall be
     punished by a fine, by imprisonment in a county jail not to exceed one year, or by
4    both a fine and imprisonment, or by imprisonment in the state prison."

5        To violate section 530.5, subdivision (a), a defendant must both (1) obtain
     personal identifying information and (2) use that information for an unlawful
6    purpose.  Thus, it is the use of the identifying information for an unlawful that
     completes the crime.  Each separate use constitutes a new crime.  (*People v.*
7    *Mitchell* (2008) 164 Cal.App.4th 442, 455.)  Nevertheless, section 530.5,
     subdivision (a) does not require an intend to defraud.  (*People v. Hagedorn* (2005)
8    127 Cal.App.4th 734, 744.)

9    **C. Law of Substantial Evidence**

10       In reviewing a judgment of conviction, the Supreme Court has stated the
     applicable standard for assessing the sufficiency of evidence:

11
         "In assessing a claim of insufficiency of evidence, the reviewing court's
12   task is to review the whole record in the light most favorable to the judgment to
     determine whether it discloses substantial evidence–that is, evidence that is
13   reasonable, credible, and of solid value–such that a reasonable trier of fact could
     find the defendant guilty beyond a reasonable doubt.  (*People v. Johnson* (1980) 26
14   Cal.3d 557, 578.)  The federal standard of review is to the same effect: Under
     principles of federal due process, review for sufficiency of evidence entails not the
15   determination whether the reviewing court itself believes the evidence at trial
     establishes guilt beyond a reasonable doubt, but, instead, whether after viewing the
16   evidence in the light most favorable to the prosecution, any rational trier of fact
     could have found the essential elements of the crime beyond a reasonable doubt.
17   (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)  The standard of review is the
     same in cases in which the prosecution relies mainly on circumstantial evidence.
18   (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)  "'Although it is the duty of the
     jury to acquit a defendant if it finds that circumstantial evidence is susceptible of
19   two interpretations, one of which suggests guilt and the other innocence [citations],
     it is the jury, not the appellate court[,] which must be convinced of the defendant's
20   guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of
     facts's findings, the opinion of the reviewing court that the circumstances might
21   also reasonably be reconciled with a contrary finding does not warrant a reversal of
     the judgment.'" [Citations.]"' (*Id*. at pp. 792-793.)" (*People v. Rodriguez* (1999) 20
22   Cal.4th 1, 11.)

23       The "sufficiency of the evidence" standard of review is the same whether
     the evidence is direct, circumstantial, or a mixture of the two.  (*People v. Towler*
24   (1982) 31 Cal.3d 105, 118; see *People v. Akins* (1997) 56 Cal.App.4th 331, 336.)

25
     **D. Analysis**
26
         In this case [Petitioner] concedes there was "ample evidence casting
27   suspicion on him."  He acknowledges he possessed an encoder, had the necessary
     software, had the victims' names and account numbers, and had a list of local
28   stores including many of the stores at which unauthorized purchases were made.

                                          28

He further concedes this "may have been sufficient to prove he had illegal access to the account information, and the opportunity to commit the charged crimes." However, he maintains it was insufficient to prove the unauthorized use charges beyond a reasonable doubt. [Petitioner] submits there was no evidence linking the unauthorized charges to himself, to accomplices Nolan Fitzpatrick or Jessica Baldwin, or to his girlfriend Suzette Jumper or her children.

We consider the entire record in the light most favorable to the judgment below and presume the existence of every fact that could reasonably be deduced from the evidence to support it. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) It is the trier of fact's exclusive province to assess the credibility of witnesses, resolve conflicts and weigh the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) Absent impossibility or inherent improbability, the testimony of a single witness is sufficient to prove a disputed fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The test is whether substantial evidence supports the jury's conclusion, not whether the evidence proves guilty beyond a reasonable doubt (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.) Thus, an appellant who attacks the sufficiency of the evidence bears an enormous burden. (*Sanchez*, *supra*, 113 Cal.App.4th at p. 330.)

An appellant who contends some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. A recitation of only defendants' evidence is not the demonstration contemplated under this rule. The reviewing court is not called upon to make an independent search of the record where this rule is ignored. A claim of insufficiency of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondents. When defendants contend some particular issue of fact is not sustained, they are required to set forth in their brief all of the material evidence on the point and not merely their own evidence. Unless this is done, the error is deemed to be waived. (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282.)

In this case, [Petitioner] concedes the first element of section 530.5, subdivision (a), i.e., "the state presented evidence showing that the account numbers of all 48 victims' account[s] were found in [Petitioner's] possession" and further concedes "jurors could reasonably find the third element satisfied–that the victims did not consent to certain charges." [Petitioner] then goes on to challenge the evidence underlying the second element of section 530.5, subdivision (a) –"that it was defendant who actually used the account numbers." Without summarizing the record, [Petitioner] divides the counts in to three different groups, based on the nature of "the state's evidence."

**1. The First Group of Counts**

The first group consists of counts 7, 9, 14, 19, 21, 41-44. As to those counts [Petitioner] concedes "the prosecutor presented evidence which–... under the deferential rules of appellate review–if believed was sufficient to link the unauthorized charges to [him]. [Citations.]"

**2. The Second Group of Counts**

The second group consists of counts 26 and 32 (regarding purchases relating to motorcycles) and counts 1, 2, 4, and 34-36 (regarding purchases relating to Halloween or party supply store). As to these counts, [Petitioner] contends "the prosecutor presented evidence of purchases which the prosecutor claimed were

sufficiently linked to [Petitioner] through less probative circumstantial evidence. [Citations.]"

Counts 26 and 32 alleged unauthorized purchases using the account information of John Metcalf and Alevia Hatfield. To establish these counts, the prosecutor presented testimony to show unauthorized charges on their accounts at several motorcycle stores. The prosecutor also presented testimony from other witnesses who had seen a motorcycle in [Petitioner's] garage.

As to counts 26 and 32, [Petitioner] acknowledged the evidence showed that credit card numbers belonging to Metcalf and Hatfield had been used to make unauthorized purchases at Biker Design in Daytona Florida, Golden Valley Harley in Los Banos, and Fresno Motor Sports. During argument, the prosecutor pointed out that [Petitioner] had a list with 78 different entries, and that 60 of the stores on that list matched unauthorized purchases alleged in this action. The prosecutor acknowledged that some of the stores on the list were "very common," but pointed out that the "Harley Davidson, Los Banos store only, which is the Golden Valley Harley Davidson listed, it says Los Banos location on one of our victim's credit card accounts. That is exactly where the unauthorized purchase was. It is on [Petitioner's] list. Not a common store." [Petitioner] contends the fact that Golden Valley Harley Davidson was part of his list was "too attenuated a link to prove that [Petitioner] made the unauthorized charges alleged in counts 26 and 32." Circumstantial evidence may constitute substantial evidence of guilt. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Millwee* (1998) 18 Cal.4th 96, 132; *People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Here, the jury could infer from the [Petitioner's] list and the unauthorized charges that [Petitioner] used, or aided and abetted the use of, the personal identifying information of Metcalf and Hatfield at the Golden Valley Harley store in Los Banos.

As to counts 1, 2, 4, and 34-36, [Petitioner] acknowledges the allegations of the first amended information "charged Mr. Matteson with unauthorized use based on purchases made at Halloween or party supply stores." He further concedes the record shows that unauthorized charges at these Halloween stores, these seasonal Halloween stores and party stores, all in ... September, October, leading up to Halloween." He further noted that the jurors would have the opportunity to review "approximately 58 photos of some extremely intricate Halloween decorations that clearly were expensive." [Petitioner] submits this connection is "too tenuous to show beyond a reasonable doubt that it was [Petitioner] who made the unauthorized purchases in connection with these counts." "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D* (2002) 100 Cal.App.4th 115, 126.) "'[W]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations].'" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394, italics omitted.) Here, the jury could reasonably and fairly infer from the Halloween party photographs and the unauthorized charges at various Halloween stores that [Petitioner] used, or aided and abetted the use of, the personal identifying information of the victims named in Counts 1, 2, 4, and 34 through 36.

**3. The Third Group of Counts**

As to the remaining counts, the [Petitioner] argues:

"Of course the prosecutor was fully entitled to proceed on an aiding and

abetting theory. But she was also required to prove her theory beyond a reasonable doubt. As to counts 3, 5, 6, 8, 10, 11, 12, 13, 15, 16, 17, 18, 20, 22, 23, 25, 27, 28, 29, 30, 31, 33, 37, 38, 39, 40, 45, 46, and 48 there simply was no evidence linking the unauthorized charges to [Petitioner]. Nor was the evidence presented to link any specific purchase to accomplices Nolan Fitzpatrick or Jessica Baldwin, or to [Petitioner's] girlfriend Suzette Jumper or her children. Convictions may not be had on these counts based on mere suspicion or speculation (*People v. Tran* [1996] 47 Cal.App.4th [759.] 771-772; *People v. Johnson, supra,* 26 Cal.3d at pp. 576-577.)"

Aiding and abetting is a theory upon which a person may be held accountable for an offense committed by another. (*People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497.) "'[A]n aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Hickles* (1997) 56 Cal.App.4th 1183, 1193.) [Petitioner] correctly contends the prosecutor could proceed on an aiding and abetting theory and that suspicion and speculation are insufficient bases for conviction. However, the very settled rule of appellate review is a trial court's judgment is presumed to be correct, error is never presumed, and the appealing party must affirmatively demonstrate error on the face of the record. (*People v. Davis* (1996) 50 Cal.App.4th 168, 172.) [Petitioner's] summary contention is not supported by a summary of the material evidence–favorable and unfavorable–on this issue. Under California law, it is incumbent upon appellants to state fully, with transcript references, the evidence claimed to be insufficient to support the findings. (*People v. Dougherty, supra,* 138 Cal.App.3d at p. 283.) "An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant." (*In re S.C.* (2006) 138 Cal.App.4th 396, 402.) The burden to provide a fair summary of the evidence grows with complexity of the record. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.)

Here, [Petitioner] has supplied numerous transcript references but not a complete statement of the evidence claimed to be insufficient to support the findings. Moreover, the trial court received more than 150 documentary and other exhibits into evidence. However, [Petitioner] has not designated those exhibits for transmittal to or consideration by this court (Cal. Rules of Court, rule 8.224). A claim of insufficiency of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondents. A reviewing court will not engage in an independent review of the record where, as here, this rule is ignored. (*People v. Dougherty, supra,* 138 Cal.App.3d at p. 282.) [Petitioner's] contention is deemed waived.

(Ex. A at 27-33.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential

1  elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

2  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.  On federal

3  habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. V.

4  Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  A federal court may not grant a habeas petition

5  unless it finds that the state court was "objectively unreasonable" in applying the principles

6  underlying the Jackson standard when reviewing the petitioner's claim.  Cavazos v. Smith, 132

7  S.Ct. 2, 3, (2011). This Court must determine whether the state decision was an unreasonable

8  application of the Jackson standard.  As the Supreme Court recently reiterated,

> A reviewing court may set aside the jury's verdict on the ground of insufficient
> evidence only if no rational trier of fact could have agreed with the jury.  What is
> more, a federal court may not overturn a state court decision rejecting a sufficiency
> of the evidence challenge simply because the federal court disagrees with the state
> court.  The federal court instead may do so only if the state court decision was
> "objectively unreasonable." *Renico v. Lett*, 559 U.S. __, __, 130 S.Ct. 1855, 1862,
> 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

Cavazos, 132 S.Ct. at 3.

As previously stated, California Penal Code section 530.5(a) states:

> Every person who willfully obtains personal identifying information, as defined in
> subdivision (b) of Section 530.55, of another person, and uses that information for
> any unlawful purpose, including to obtain, or attempt to obtain, credit goods,
> services, real property, or medical information without the consent of that person,
> is guilty of a public offense, and upon conviction therefor, shall be punished by a
> fine, by imprisonment in a county jail not to exceed one year, or by both a fine and
> imprisonment, or by imprisonment in the state prison.

20  Petitioner's sole challenge is to the second prong of California Penal Code section 530.5(a)

21  in which he claims the State failed to prove that he used the personal account information for an

22  unlawful purpose.  When Nolan Fitzpatrick, Jessica Baldwin, and Patrick Adolph went to

23  Petitioner's residence to obtain false identification cards, Petitioner solicited each of them to skim

24  credit cards at the restaurants where they worked.  (RT 738-740, 743, 809-810, 813-814, 859-

25  860.)  Kristen Larsen also went to Petitioner's residence to obtain a false identification card and

26  Petitioner asked her if she knew anyone employed in the restaurant business.  (RT 768-781.)

27          James Lutter, a computer forensic examiner for the Fresno Police Department, analyzed

28  various pieces of equipment found at Petitioner's home, and explained how the equipment

1   contained the necessary software to fraudulently skim credit card information for personal use.

2   (RT 1095-1124.)

3       Petitioner's girlfriend, Suzette Jumper told Detectives Ground and Dodd that Petitioner

4   had purchased an X-box with a stolen credit card, which was found at Petitioner's residence. (RT

5   1648-1651.)  Jumper also disclosed that Petitioner shopped on a regular basis using the stolen

6   credit card information.  (RT 1651.)

7       A search of Petitioner's residence was conducted, and Petitioner was found to be in

8   possession of the card information near the time the unauthorized charges had been deducted from

9   the accounts.  Numerous receipts were found in Petitioner's home which matched certain

10  unauthorized charges made to the accounts of the victims in counts 7, 14, 19, 21, 41-44 at several

11  stores in the Fresno-area, including Foods Co., Wal-Mart, Marshall's Office Depot, Sears,

12  Victoria's Secret, Macy's, Best Buy, and Kohl's.  As to Count 9, an unauthorized charge at Best

13  Buy was deducted from the victim's account for a Sunpak 7500 TM tripod, which was found at

14  Petitioner's home.  (RT 1172, 1450-1452.)  In addition, several shredded receipts were found at

15  Petitioner's home for Pep Boys, Cost Plus, Save Mart, Orchard Supply, Harbor Freight Tools, and

16  Fresno Motor Sports-the same stores where several unauthorized charges related to the identity

17  theft counts occurred.  (See RT 1141-1147 [count 15], 1151-1155 [count 5], 1155-1159 [count

18  33], 1163-1166 [count 10], 1180-1186 [count 7], 1186-1192 [count 3], 1192-1195 [count 32],

19  1201-1203 [count 25], 1207-1211 [count 16], 1260-1266 [count 45], 1266-1272 [count 44], 1296-

20  1305 [count 2], 1311-1316 [count 18], 1317-1321 [count 23], 1321-1326 [count 43], 1332-1337

21  [count 4], 1338-1345 [count 21], 1352-1357 [count 6], 1359-1364 [count 48], 1366-1372 [count

22  24], 1372-1376 [count 12], 1378-1381 [count 29], 1388-1390 [count 37], 1394-1399 [count 22],

23  1410-1412 [count 19], 1418-1423 [count 13], 1446-1452 [count 9], 1460-1465 [count 27], 1466-

24  1470 [count 28], 1471-1473 [count 14], 1479-1483 [count 40], 1484-1492 [count 1], 1520-1524

25  [count 31], 1530-1534 [count 39], 1535-1538 [count 46], 1539-1542 [count 30], 1546-1550

26  [count 17], 1557-1560 [count 26], 1567-1570 [count 34], 1593-1598 [count 11], 1609-1613

27  [count 42], 1614-1618 [count 20], 1632-1637 [count 8], 1663-1667 [count 38], 1685-1691 [count

28  36], 1705-1708 [count 35], 1741-1743 [count 41].  Petitioner also had a list of places the

1  fraudulent cards could be used, which clearly demonstrates that Petitioner knew where the cards

2  were being used.  (RT 742-743.)

3      There were several purchases made at Halloween stores, and there was evidence Petitioner

4  had a Halloween party with elaborate decorations.  (RT 994, 1197.)  Nolan Fitzpatrick actually

5  saw Petitioner using the victim's credit card numbers to purchase items at various stores, and

6  Baldwin observed Petitioner buy her a lap top computer at Best Buy.  (RT 820-821, 867-868.)  In

7  exchange for Fitzpatrick and Baldwin scanning customer's credit cards at Red Robin and

8  Goldfield's, they were each given fraudulent gift cards and both used them to purchase items.

9  (RT 817-819, 865-868.)  When Adolph purchased a fake identification card from Petitioner,

10 Petitioner solicited him to scan credit cards of customers at the Sequoia Brewery Restaurant

11 where he worked, and Petitioner offered to take him Christmas shopping for doing so.  Patrick

12 Adolph observed several fraudulent credit cards in Petitioner's wallet, and Petitioner showed him

13 numerous items in his home, including a flat screen television that he had purchased with the

14 fraudulent cards.  (RT 740-741.)

15      Moreover, the majority of the account information was obtained from victims who had

16 used their cards at Goldfield's restaurant or Red Robin restaurant during the time Fitzpatrick and

17 Baldwin were skimming cards for Petitioner at these restaurants. (RT 1141-1147 [count 15],

18 1151-1155 [count 5], 1163-1166 [count 10], 1180-1186 [count 7], 1201-1203 [count 25], 1207-

19 1211 [count 16], 1260-1266 [count 45], 1266-1272 [count 44], 1296-1305 [count 2], 1311-1316

20 [count 18], 1317-1321 [count 23], 1321-1326 [count 43], 1332-1337 [count 4], 1352-1357 [count

21 6], 1359-1364 [count 48], 1366-1372 [count 24], 1446-1452 [count 9], 1460-1465 [count 27],

22 1466-1470 [count 28], 1471-1473 [count 14], 1479-1483 [count 40], 1484-1492 [count 1], 1520-

23 1524 [count 31], 1530-1534 [count 39], 1539-1542 [count 30], 1546-1550 [count 17], 1593-1598

24 [count 11], 1609-1613 [count 42], 1614-1618 [count 20], 1632-1637 [count 8], 1682-1685 [count

25 47].)  Furthermore, the unauthorized charges stopped the day before Petitioner was arrested.

26

27      Considering all of the evidence in favor of the prosecution, there was sufficient evidence

28 from which the jury could reasonably infer that Petitioner either used or aided and abetted the use

34

1  of the victim's account information, and the state court's determination of this issue was not

2  contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

3  V.       Evidentiary Hearing

4           Petitioner requests an evidentiary hearing to resolve the aforementioned claims.  Because

5  Petitioner's claims can be resolved on the existing state court record, an evidentiary hearing in this

6  Court is precluded.  Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (evidentiary hearing

7  unwarranted if "the record refutes the applicant's factual allegations or otherwise precludes habeas

8  relief); see also Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) (affirming denial of

9  evidentiary hearing because the applicant's factual allegations "fl[ew] in the face of logic in light

10 of . . . [the applicant's] deliberate acts which are easily discernible from the record").

11 Accordingly, Petitioner's request for an evidentiary hearing should be denied.

12                                      RECOMMENDATION

13          Based on the foregoing, it is HEREBY RECOMMENDED that:

14          1.       The instant petition for writ of habeas corpus be DENIED;

15          2.       The Clerk of Court be directed to enter judgment in favor of Respondent.

16          This Findings and Recommendation is submitted to the assigned United States District

17 Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

18 Local Rules of Practice for the United States District Court, Eastern District of California.  Within

19 thirty (30) days after being served with a copy, any party may file written objections with the court

20 and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

21 Judge's Findings and Recommendation."  Replies to the objections shall be served and filed

22 within fourteen (14) days after service of the objections.  The Court will then review the

23 /////

24 /////

25 /////

26 /////

27 Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

28 failure to file objections within the specified time may waive the right to appeal the District

1   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2        IT IS SO ORDERED.

3   **Dated:**   **July 13, 2012**          **/s/ Barbara A. McAuliffe**
                                    UNITED STATES MAGISTRATE JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28